# EXHIBIT D

*Confidential*

# IN THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## BALTIMORE DISTRICT OFFICE

| | |
|---|---|
| KATHERINE NEEDLEMAN, | * |
| Claimant, | * |
| v. | Charge No. 531-2018-03208 |
| | * |
| BALTIMORE SYMPHONY ORCHESTRA, | |
| | * |
| Respondent. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF KATHERINE NEEDLEMAN

I, Katherine Needleman, declare as follows:

1. I am over 18 years of age and competent to make this declaration.

2. I submit this declaration to supplement my Charge of Discrimination filed with the EEOC in September 2018 with an updated and fuller timeline of the Baltimore Symphony Orchestra's ("BSO") retaliatory conduct towards me. Much has occurred since I filed my Charge with the EEOC and this timeline provides a more comprehensive picture of the retaliation I have endured since reporting Mr. Carney's harassment to BSO management in 2018. At the conclusion of this declaration, I have also included some updates regarding Mr. Carney's continued harassment and information I have learned about Melissa McGuire and BSO management's bias against me and my claims since filing my Charge.

3. On January 10, 2018, I once again reported Mr. Carney's pattern of harassment to BSO management by email.

4. On January 17, 2018, BSO management calls me to a meeting. I attempt to bring ███████, a member of the Players' Committee, along with me. BSO management refuses to allow ███████ to attend the meeting with me. Later, Rochelle Skolnick, an attorney for our union, tells me that management cannot dictate whom I bring to a meeting. At this meeting, BSO

*Confidential*

management asks me to sign a confidentiality agreement without Ms. Myer there, an unfair labor practice and violation of section 7 of the National Labor Relations Act.

5.  After the BSO closes its investigation into my harassment claims in late February 22, 2018, recommending only that Mr. Carney and I engage in mediation, I retain an attorney. My attorney writes to the BSO on my behalf in March 2018.

6.  Less than a week after Jinny Kim, the BSO's Director of Orchestra Personnel, is interviewed by Melissa McGuire as part of her investigation into my allegations, commissioned by the BSO, Ms. Kim, on April 11, 2018, cites me for a dress code violation. This is the first and only time I have ever been notified of a dress code violation in my entire career with the BSO. I receive an email stating that my boots do not comply with the BSO's dress code. I have worn these same boots onstage for the past three years without comment from management. When I object to the reprimand, BSO management calls me in for a meeting about the issue. Other women continue to wear boots onstage presently. A true and accurate copy of my email exchange with BSO management about the dress code issue is attached as Exhibit A.

7.  On April 13, 2018, just two days after I am cited for wearing boots on stage, Mr. Carney wears a yellow tie, in violation of the BSO's dress code, at a concert. BSO President and CEO Peter Kjome, BSO Vice President & Chief Financial Officer Sarah Beckwith, and Vice President and General Manager Tonya McBride Robles are all in close proximity to Mr. Carney during this performance and the BSO shares a photograph of Mr. Carney in his yellow tie on its Facebook page. A true and accurate copy of photos from the BSO's Facebook post, with red circles drawn around Mr. Carney, are attached as Exhibit B.

2

*Confidential*

8.  On April 12, 2018 and again on April 18, 2018, my attorney communicates concerns about uneven application of the BSO's dress code policy to Melissa McGuire. Ms. McGuire never responds. True and accurate copies of her emails are attached as Exhibit C.

9.  Five weeks after my attorney wrote to the BSO and in the midst of Ms. McGuire's investigation into my allegations, Barbara Bozzuto, chair of the BSO board, emails the entire orchestra about how "brilliant" Mr. Carney was that week. A true and accurate copy of this email is attached as Exhibit D. I was struck that the BSO was not only refusing to provide anonymity to witnesses who were afraid to come forward to speak out against Mr. Carney and refusing to place him on leave during the investigation, but was now publicly praising him to the entire orchestra.

10. On April 26, 2018, I ask for Jinny Kim's help communicating tuning needs to Mr. Carney with ▬▬▬▬ as a witness. She does not communicate my tuning needs to Mr. Carney, choosing simply not to address them, and did not tell me about her decision until it was too late, compromising tuning for the April 29, 2018 concert. I am responsible for tuning the orchestra and did not get a second A for the winds I had asked for. This was professionally embarrassing and harmful, particularly since some members of the winds section were expecting a second A after I told them I would take care of it and were not able to tune at all. A true and accurate copy of my email to Ms. Kim regarding the incident, as well as email confirmation from ▬▬▬▬ confirming my discussion with Ms. Kim, is attached as Exhibit E.

11. In May 2018, BSO management requires me be a part of a flute audition committee when I asked for a break. I have been a part of this unsuccessful process to find a tenured Assistant Principal flute since 2004. It has been onerous and poorly run. I am told I must forfeit my day off to prepare for tour programs to be a part of this process despite my objections

3

*Confidential*

because I am contractually obligated. However, a concurrent viola audition does not require the audition committee compliment to abide by the contract, and five violists were let out of their contractual obligation. The personnel manager was selectively enforcing the contract to my detriment. True and accurate copies of emails confirming that musicians who were contractually obligated to participate in viola auditions were excused are attached as Exhibit F.

12. On September 14, 2018, I file my Charge of Discrimination with the EEOC. Three days later, on September 17, approximately one hour before news of my Charge broke, the BSO sends an email to all musicians asking them to refrain from discussing the upcoming news internally or externally, and not to share the news on social media. This served to invalidate my allegations and could have dissuaded others with similar accusations from coming forward. A true and accurate copy of the BSO's email is attached as Exhibit G.

13. On September 30, 2018, BSO management contacts my Assistant Principal oboist about a seating change (regarding who would play first oboe on which piece in an upcoming performance) in my section before me. I have always previously been in charge of seatings as principal of the section, as is every other principal in the orchestra. When my Assistant Principal oboist eventually backs out of the solo that I relinquished to her, in light of her being consulted about the matter before I was by BSO management, just days before the performance, I am forced to quickly prepare to play an unusual instrument without adequate time. This jeopardizes my professional reputation. Had BSO asked me about performing this solo first, as it does with all other principal players, this situation would have been avoided.

14. In early October 2018, the BSO institutes a protocol change regarding substitute hiring without my knowledge or clearance in the oboe section. Now, the Assistant Principal oboist is consulted at the same time as I am. No other section operates in this way. I discover

4

*Confidential*

this happened only in January 2019. When I contact Jinny Kim about this, she confirms that in all other sections, only the principal musician is consulted about these matters. I ask to stop being treated differently from other section principals. A true and accurate copy of my email exchange with Jinny Kim about his issue is attached as Exhibit H.

15. On February 17, 2019, the BSO informs me that they will dock my pay if my Assistant Principal oboist calls in sick during the upcoming week, when I was scheduled to be rotated off-call out of town. This is after she insisted upon playing a difficult oboe d'amore solo that I wanted to do, I gave it to her because I didn't feel I had any reasonable choice given the BSO's protocol change just for my section, and then she called in sick in the middle of the week. I played an unusual instrument requiring all new reeds on no notice, spent all night making new reeds because of the short notice, and told Jinny Kim that. After doing this to cover all of her parts, as well as my own to make as good of a concert as possible at risk to my own reputation, BSO indicates that my pay will be docked for the entirety of the upcoming week if my Assistant Principal is sick again, even though I only need to be absent for part of the week. I had saved the BSO any cost of hiring a substitute when my Assistant Principal was previously out sick. I propose that if her condition improves, my Assistant Principal and I could share the upcoming week, with me playing the earlier part, but the BSO rejects this idea for "artistic reasons." I explain that this would be artistically preferable to bringing in a substitute to play principal oboe the whole time, particularly on such short notice. Tellingly, the BSO allowed Mr. Carney to take turns with Associate Concertmaster ████████, just as I had proposed, the week prior. Despite my pointing out this unfair treatment, the BSO continues to deny me the same option, instead insisting that I either agree to play the entire week or have my pay docked for the entire

5

*Confidential*

week. A true and accurate copy of my email exchange with Jinny Kim about this issue is attached as Exhibit I.

16. On March 5, 2019, the BSO changes the rotation off-call policy for me. I had never before been denied a "rotation out of town" when requested if I was already off that week. Ms. Kim indicates she is changing my "off call rotation" moving forward. This sudden change in policy feels punitive. A true and accurate copy of my email exchange with Ms. Kim about this issue is attached as Exhibit J.

17. On June 11, 2019, the BSO denies my leave request and, because of the ensuing lockout all summer (when my leave had originally been scheduled for), makes me forfeit my remaining personal leave for the season. The BSO does not pay me back for this leave and Sarah Beckwith does not respond to my emails about the issue. A true and accurate copy of my email exchange with BSO management about this issue is attached as Exhibit K.

18. On June 15, 2019, the BSO reprimands me for using a Digital Music Reader onstage on an iPad. This concert is in the dark, and I have never been able to use stand lights in my career and this makes it infinitely easier for me to see. The music director was onstage with an iPad on the BSO's social media the same week. Mary Plaine from the union requests the policy prohibiting the use of digital music readers and we never receive it. After hearing from Ms. Plaine, BSO management eventually agrees to let me use the music reader for the remainder of the weekend's concerts, but notes that "this does not set any precedent." True and accurate copies of my email exchange with Ms. Kim about this issue, as well as Ms. Plaine's email to Ms. Kim, are attached as Exhibit L.

19. On June 25, 2019, I send many unanswered emails to the BSO about approximately $3,500 in 403b deductions from my paychecks that BSO has failed to deposit in

*Confidential*

my Fidelity account. This is money I have earned. There is no employer match. In some cases, the funds are more than six months delayed, or missing altogether. When the BSO fails to respond, I contact Jinny Kim by phone and ask why no one has responded to my emails. She has no answer. I ask if she was told not to respond to me and she replies, "well...not necessarily." The BSO continues to offer no substantive response, forcing me to file a lawsuit in Baltimore City District Court on July 2, 2019 to recover my missing earnings.

20. When I return to the BSO after the summer lockout, in the fall of 2019, I ask Donna Waring in payroll if the BSO plans to deposit my 403b funds on time in the future. On November 13, 2019, I am reprimanded verbally and threatened with disciplinary action by Sarah Beckwith for the "unacceptable and unprofessional" act of asking Ms. Waring about this payroll issue, instead of asking Ms. Beckwith. I reached out to Ms. Beckwith about this issue over the summer, however, but received no response. A true and accurate copy of my email to Ms. Beckwith, along with other senior members of BSO management, is attached as Exhibit M.

21. When the lockout ended in September 2019, I wanted to come into the building to pick music up out of my mailbox. It becomes clear that the BSO will not allow me in the building without an escort. I have never required an escort in the building at any other time of my employment. A true and accurate copy of my email exchange with Jinny Kim confirming that I now need an escort to enter the building is attached as Exhibit N.

22. On September 23, 2019, BSO management once again contacts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at the same time as me about substitute hirings in the oboe section. I remind the Personnel Office that they told me they would revert to the old protocol they follow with every other principal in the orchestra: to deal with seatings and substitute hirings

7

*Confidential*

exclusively through the principal. I quote to them the email where they told me this. A true and accurate copy of my email exchange with Ms. Kim about this issue is attached as Exhibit O.

23. Even after I remind BSO management to contact me about substitute hirings and seatings, management goes ahead and talks to another member of my section, instead of to me directly, about the availability and interest of other oboe players in my section to fill in as first oboe when my Assistant Principal and I are away. As a result, an outsider is hired to play first oboe while ███████, a permanent member of the BSO oboe section is not extended the courtesy of being asked directly by management. ███████ was very upset. I reiterate the need for management to go through me instead of other non-principal members of my section, and ███████ makes the same request that BSO not make decisions about the oboe section without first consulting me. True and accurate copies of my email exchange with BSO management and ███████'s email exchange with management as well are attached as Exhibit P.

24. On September 27, 2019, I make a request to use a Digital Music Reader onstage since I am unaware of any policy prohibiting them but was reprimanded last time. I provide a list of reasons why it is artistically valuable to allow this technology onstage. I have noted soloists and conductors using them, before and after my June reprimand. I want to use it because it allows me to play from the score, which is impossible otherwise, and have been using it in other concerts and with other orchestras while locked out over the summer. It improves my work, or any musician's work, to use this newish technology to read from the score. I am granted the request for one week only, due to "extenuating circumstances." A true and accurate copy of my email exchange with BSO management about this issue is attached as Exhibit Q.

*Confidential*

8

*Confidential*

25. When I ask for permission to use a Digital Music Reader again on October 14, 2019, the BSO denies my request. Although Ms. Kim cites "current policies," BSO management still has not been able to produce any policy to me that prohibits use of a Digital Music Reader. This denial comes after I have noted to BSO management that Music Director Marin Alsop, Associate Conductor Nicholas Hersh, and guest soloist Conrad Tao have all used them. A true and accurate copy of my email exchange with Ms. Kim about this issue is attached as Exhibit R.

26. My personal contract with the BSO states that "best efforts" will be made to feature me in a concerto (solo in front of the orchestra) appearance at least every other season. I am not playing a concerto this season (2019-2020), and had not heard anything from management about an appearance next season, when typically I would have by November of this year. After learning that there are still many gaps in next season's schedule that could be filled with orchestra soloists and that Mr. Carney is scheduled to play a concerto next season (after he played a concerto this past May as well), I write to Ab Sengupta, Artistic Administrator, on November 4, 2019, to ask about his plans with regard to my solo appearance. He responded only that: "There is a desire to feature soloists from within our orchestra in the 20/21 season. I will be in touch as these plans take shape and appreciate you're [sic] openness." I replied, "In case you were not aware, my contract details a solo engagement every other year, which would provide for an outing in 20/21." On November 25, 2019, I finally heard back from Mr. Sengupta proposing to schedule me for a sinfonia concertante (an orchestra work that features orchestra and a group of soloists) that would feature four soloists at once. This quadruple concerto would be far less exposure than I've had in the past, and would not be much of a solo vehicle. Throughout my time in the BSO, I have always had a solo concerto at least every year and often more frequently (2003-2004, 2004-2005, 2005-2006, 2007-2008, 2009-2010, 2010-2011, 2012-

*Confidential*

2013, 2014-2015, 2015-2016, 2017-2018, and 2018-2019). My concerto performances have always received extremely favorable reviews and ███████, community liaison at Strathmore, has told me they sell quite well. It appears that the BSO is limiting my exposure for next season. A true and accurate copy of my email exchange with Ab Sengupta about this issue is attached as Exhibit S.

27. On November 13, 2019, I am called into a mandatory meeting with Sarah Beckwith, Tonya Robles, and ███████. Ms. Robles seemed uninterested and as if she had not read my reasons for wanting to use a Digital Music Reader. Ms. Beckwith immediately notes that someone such as me who has "alleged retaliation" must also be held accountable for "unprofessional behavior." She focuses on my "unacceptable and unprofessional behavior" and cites the "volume and tone" of my emails as well as the "unfriendly nature" of those emails. She notes there have been no complaints brought up about my emails and her own problems with them are expressed vaguely. After the meeting, ███████ told me he had never seen someone called in for a mandatory meeting over such vague complaints. The complaints focused on sending emails to junior members of BSO management that they felt should be addressed to senior members of management, as well as my asking Donna Waring in payroll a question about my 403b deductions. I told Ms. Beckwith that I respond to emails sent by the person who sends them, and I went to Ms. Waring because Jinny Kim told me to. Ms. Beckwith said I should have gone to her with that question and it was "unacceptable." She adds, "Maybe you should speak to your accountant about concerns about 403b payments if they are not satisfactory." I indicate that when I reached out to her directly this summer, she never responded. ███████ also offers that he has a lot of trouble getting her to respond to email. Ms. Beckwith tells me at the meeting that the BSO would not take disciplinary action against me for emails "yet" and that she is

*Confidential*

having this conversation with me so that if I am disciplined in the future I won't be surprised. After the meeting, ██████ emails me, "I don't blame you for feeling that Tonya [Robles] and Sarah [Beckwith] might be targeting you." A true and accurate copy of my email exchange with ██████, documenting and discussing the content of the mandatory meeting, is attached as Exhibit T.

28. The day after this mandatory meeting, on November 14, 2019, I receive a letter from BSO informing me that they are changing the way they calculate my overscale payment—a departure from how my pay has been calculated in all of my previous BSO annual contracts that reduces my total salary. While all my colleagues will receive a small raise in weekly salary this year, I will receive less than the previous year. I send Tonya Robles an email stating that the letter she sent describes a change in calculation of my salary that is both punitive, against all past precedent, and is in violation of our Collective Bargaining Agreement. A true and accurate copy of this email is attached as Exhibit U. In response to my pointing out that the new method of calculation violates the Collective Bargaining Agreement, BSO makes a small adjustment to my salary calculation, but it continues to calculate my overscale payment in a way that reduces my overall compensation.

29. In addition to BSO's retaliatory conduct, Mr. Carney's harassing treatment of me has also continued since I filed the EEOC Charge. On January 18, 2019, for example, Mr. Carney ignored me during tuning for the concerto. Faced with an uncomfortable choice, I chose to give a second A for the oncoming wind players after Carney sat down, and he retaliated later in the rehearsal by mocking me. A true and accurate copy of my email to Jinny Kim documenting this behavior is attached as Exhibit V. A true and accurate copy of an email I sent myself contemporaneously documenting what had transpired is attached as Exhibit W. Although

11

*Confidential*

I shared with Ms. Kim what had transpired on January 19, she did not contact me for further information about this incident until February 7.

30.  After I filed my Charge, I learn that Melissa McGuire disparaged me while interviewing a colleague, ▅▅▅▅▅, about her own claims of harassment against Mr. Carney. On February 6, 2019, Ms. McGuire, during her meeting with ▅▅▅▅▅, tells her that the concerns of most women she spoke to in investigating my claims led her to believe they had never before existed in a "real" workplace. Ms. McGuire further indicated that she "really wished" ▅▅▅▅'s colleagues "would refrain from going to the press"—clearly referring to me. I was deeply concerned that Ms. McGuire felt the need to disparage me in the course of investigating another claim of sexual harassment. A true and accurate copy of ▅▅▅▅'s email exchange with BSO management about Ms. McGuire's remarks is attached as Exhibit X.

31.  In the course of the BSO's handling of ▅▅▅▅'s sexual harassment claims against Mr. Carney, I also learn that BSO Vice President & Chief Financial Officer Sarah Beckwith told ▅▅▅▅ that some women's claims of sexual harassment at the BSO seemed "gossipy." *See* Ex. X.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 26, 2019

Katherine Needleman

12